**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANIBAL SANTIAGO,** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 1:CV-02-1217** |
| | : | **(Judge Kane)** |
| | : | |
| **YORK CITY,** | : | |
| **Defendant** | : | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant's Motion for Summary Judgement.  (Doc. No. 56.)  The motion

has been fully briefed and is ripe for disposition.  For the reasons discussed below, the motion will be

granted.

I.    **Background**[1]

Plaintiff is a Hispanic male of Puerto Rican ancestry, born in 1957.  Plaintiff began working for

the City of York Police Department on September 10, 1990 as a patrol officer.  In March of 1999,

Plaintiff circulated election petitions for the Republican and Democratic nomination for the position on

the City of York school board.  Because Plaintiff was unable to secure the necessary number of

signatures on the Republican petition, Plaintiff only appeared on the ballot as a Democrat in the March

---

[1]   The following are undisputed facts.  As Plaintiff failed to file a statement of facts in opposition
to Defendant's statement of undisputed material facts, Defendant's statement of facts (Doc. No. 58)
are deemed to be admitted as true except where directly controverted by the record.  See Local Rules
56.1 ("The papers opposing a motion for summary judgment shall include a separate, short and concise
statement of the material facts, responding to the numbered paragraphs set forth in the statement
required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be
tried. . . .  All material facts set forth in the statement required to be served by the moving party will be
deemed to be admitted unless controverted by the statement required to be served by the opposing
party").

1999 primary.  York Police Department's Rules of Conduct 91-001-2 IV.39(4) prohibits police officers from "becoming candidates for or campaigning for a partisan elected public office."

Upon learning that Plaintiff was seeking the Democratic nomination for school board, Captain Ressler notified Plaintiff by way of memorandum that he was in violation of the Rules of Conduct. Captain Ressler insisted that Plaintiff either withdraw his candidacy or resign from the Police Department.  On March 17, 1999, Plaintiff withdrew his nomination for school board.  Nevertheless, on April 13, 1999, Plaintiff appeared before a trial board, whereupon he was found guilty of the violation and suspended for one day without pay.  (Plaintiff's Exs. 6 and 24.)  Plaintiff appealed to binding mediation in accordance with the applicable Collective Bargaining Agreement.  (Defendant's Ex. 30.)  Following a hearing, the mediator on July 13, 1999 found that Plaintiff violated the Rules of Conduct.  The mediator also found that Plaintiff failed to present sufficient evidence of discriminatory action on the part of Defendant.  Nevertheless, the mediator directed that the reprimand be removed from Plaintiff's personnel file after December 1, 1999.

Thereafter, Plaintiff filed an administrative charge with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant's conduct with respect to the discipline Plaintiff received was discriminatory in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951-956 ("PHRA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  After conducting a fact-finding mission, by opinion dated October 27, 1999 the PHRC dismissed Plaintiff complaint, finding that there was no

evidence of discriminatory conduct by Defendant.[2]

In June 2001, while off duty, Plaintiff made comments to the press regarding Police Commissioner Grofcsik's association with then York Mayor Robertson, who at the time had criminal charges filed against him in connection with the murder of Lilly Belle Allen during the 1969 York race riots.  Plaintiff told the reporter that the Commissioner's actions with regard to Mayor Robertson "was an embarrassment to us police officers, and the mayor and [commissioner Grofcsik] should both resign for the betterment of the city, and it was a pathetic display of law enforcement officers."  (Plaintiff's Deposition, Defendant's Ex. 3, Vol. 1 at 97.)  The York Dispatch and York Daily Record reported Plaintiff as stating "[Grofcsik] made several public comments about police supporting the mayor 100 percent. . . . Yesterday, [Grofcsik] was sitting in court at the defense table.  It is a pathetic display for a law enforcement office.  It's embarrassing to us. . . . I am a policeman.  Our job is difficult enough without having the people of the city thinking we think like the mayor and Grofcsik."  (June 27, 2001 York Daily Record Article, Defendant's Ex. 10.)

As a result of the statements attributed to Plaintiff in the newspaper articles, Lt. Arnold issued a memorandum dated June 27, 2001 to Plaintiff inquiring whether the quotes attributed to him were correct.  On June 27, 2001, Plaintiff acknowledged that he made the above statements.  Accordingly, Lt. Arnold issued a June 8, 2001 memorandum advising Plaintiff that he had violated provisions of the Rules of Conduct, which state in pertinent part:

members shall not publicly criticize or ridicule the City or any official thereof,

_____

[2] The EEOC adopted the findings of the PHRC in dismissing Plaintiff's claim.  (Plaintiff's Ex. 1.)

the department, its policies, procedures or regulations, or other members by
speech, writing or other expression, where such speech . . . is defamatory,
obscene, unlawful, undermines the effectiveness of the department, interferes
with maintenance of discipline, or is made with reckless disregard for truth or
falsity.

(Rules of Conduct 91-001-02, IV.B.35.A.)  Additionally, Plaintiff was also charged with violating Rule

IV.B.36(a) which prohibits "constructive criticism of any department, operation, employee or police of

the city government" discussed outside of the department and chain of command.  (Rules of Conduct

91-001-02, IV.B.36(a).)

Plaintiff appealed the discipline to a trial board, which held a hearing on July 25, 2001.  The

board found that Plaintiff had violated provisions of the Rules of Conduct and recommended suspension

of four days.  The board also advised changing the policy in order to clarify "that officers may speak to

the press, however; they are limited as to what they can speak about."  (July 26, 2001 memorandum,

Defendant's Ex. 14.)  Plaintiff subsequently appealed the board's decision to binding, mandatory

arbitration pursuant to his Collective Bargaining Agreement.  The arbitration took place on February 6,

2002.  In his opinion dated May 21, 2002, the arbitrator rejected Plaintiff's First Amendment

arguments and found that the discipline imposed by Defendant was proper.  (Arbitrator's Decision,

Defendant's Ex. 15.)

On July 7, 2001, Plaintiff failed to appear for a voluntary overtime assignment.  (Plaintiff's

Deposition, Defendant's Ex. 3, Vol III at 67-70.)  When his Sergeant called him at home, Plaintiff

stated that he "wasn't feeling well that day" and had overslept.  Id.  On August 11, 2001, Plaintiff was

issued a written "oral reprimand" for failing to report without first contacting a supervisor.  (Defendant's

Ex. 16.)  The reprimand was temporary and scheduled to be removed from Plaintiff's file after one

year.  Id.

On August 5, 2001, Plaintiff arrived a half an hour late for duty.  Plaintiff received a written reprimand, to be removed from his file after two years.  (August 24, 2001 reprimand, Defendant's Ex. 17-1.)[3]  On August 22, 2001, Plaintiff failed to appear in court for a criminal case.  Plaintiff received a written reprimand, to be removed from his file after two years.  (August 27, 2001 reprimand, Defendant's Ex. 17-2.)  On October 24, 2001, Plaintiff appeared in court without bringing the evidence needed to prosecute the case.  Plaintiff received a written reprimand from Lt. Arnold.  (November 15, 2001 reprimand, Defendant's Ex. 18.)

On December 11, 2001, Plaintiff submitted a note to Captain Ressler from Dr. Harberger, stating that Plaintiff should be excused from work until January 8, 2002 "as he shall be under my care." (Defendant's Ex. 19.)  The note did not provide a diagnosis nor in any way state why Plaintiff was under Dr. Harberger's care.  Id.  Captain Ressler sent Plaintiff a memorandum dated December 12, 2001 requesting additional information concerning Plaintiff's medical condition and any medications or treatments prescribed.  (Defendant's Ex. 21.)  Captain Ressler also asked for an original copy of the medical note, signed by the physician in pen, not using a rubber stamp.  Id.  On December 12, 2001, Plaintiff submitted a signed note from Dr. Harberger stating that Plaintiff was "under [his] care for Acute Situational Disorder.  The anxiety and stress of the current work situation makes his continuation in police duties risky to his health."  (Defendant's Exhibit 22.)  The American Psychiatric Association's

---

[3] Defendant's Exhibits contain two exhibits marked "Exhibit 17."  The first is a written reprimand dated August 24, 2001 and the second is a written reprimand dated August 27, 2001.  The Court will refer to them as "Exhibit 17-1" and "Exhibit 17-2" respectively.

Diagnostic and Statistical Manual of Mental Disorders does not identify "Acute situational disorder" as a legitimate psychiatric diagnosis. Nevertheless, Captain Ressler approved Plaintiff for sick leave until January 8, 2002.

On January 8, 2002, Plaintiff submitted another note from Dr. Harberger indicating that Plaintiff "continues under [his] care for acute situational disorder. The anxiety and stress of his current work situation continues to prevent him from safely performing police duties including court appearances. He should be off work until February 12th at which time he will be reevaluated." (Defendant's Ex. 23.) On January 10, 2002, Captain Ressler requested Plaintiff to submit to a physical and psychiatric examination pursuant to General Order 91-004-04, regulating fitness for duty. Plaintiff appeared for both examinations and Drs. Kurland and Hostetter issued reports to Defendant indicating that Plaintiff suffered from no physical or psychological condition that prohibited him from working. (Defendant's Exs. 25 and 26.) Relevant to the instant matter, Dr. Hostetter opined that:

> [Plaintiff] gave no evidence of having a clinical psychiatric disorder which would prevent him from carrying out the duties of a police officer. . . . What [Plaintiff] describes as 'depressed mood' appeared to me to be a kind of demoralization he feels when things are going against him. He said at work he has had difficulty in dealing with his fellow officers and his superiors. He said at times he 'felt picked on every day.' . . . On the day I saw him there was no evidence of a Mood Disorder. . . . In his explanation of his difficulties, [Plaintiff] tends not to see any part he has played in bringing about those troublesome situations. He believes he has been 'written up' for minor problems for which most other officers are not cited. He also believes his supervisors have been scrutinizing his performance beyond what is reasonable. Therefore, I do see evidence of his having personality traits that contribute to his occupational difficulties. However, I did not find him to be impaired by a fully developed Personality Disorder.

(Defendant's Ex. 26.) After receiving the two reports, Captain Ressler advised Plaintiff of the results

and ordered him to return to work on February 20, 2002.  (Defendant's Ex. 27.)

By note dated February 19, 2002, Dr. Harberger opined that "stress created by this conflict seriously hampers his ability to perform his job as a police officer and would make such activity hazardous." (Defendant's Ex. 28.)  Plaintiff also submitted a note dated February 19, 2002, from a social worker, opining that Plaintiff should not return to work until he is better able to handle his "job related stress." (Id.)  The memorandum concludes with: "[m]y primary concern would be whether he would be able to concentrate and use appropriate judgment under stress.  I do, however, defer to his physician on any final decisions regarding his return to work." (Id.)

It appears from the record that these new memorandums did not change Captain Ressler's opinion regarding Plaintiff's fitness for duty.  It also appears that, notwithstanding orders to return to duty, Plaintiff refused to return to work.  Between March 5, 2002 and May 15, 2002, Plaintiff was given four reprimands at sequentially higher levels for his refusal to report to duty.  Thereafter, on June 27, 2002, a trial board convened and recommended terminating Plaintiff's employment.  Plaintiff was subsequently dismissed.

## II.    Procedural History

Plaintiff initiated this civil action with a complaint filed on July 18, 2002.  On July 29, 2002, Plaintiff filed an Amended Complaint, to which all of the named Defendants filed a Motion to Dismiss on August 23, 2002.  By Order dated October 4, 2002, this Court placed the case in civil suspense pending the adjudication of related matters before the PHRC and EEOC.  On February 28, 2003, Plaintiff filed a Second Amended Complaint.  After receiving the requisite Right to Sue letters from the EEOC and PHRC, Plaintiff then filed a Third Amended Complaint on May 30, 2003, to which all of

the named defendants filed a Motion to Dismiss on August 25, 2003.

By Order dated March 31, 2004, this Court granted Defendants' Motion to Dismiss in part, dismissing the claims against all named Defendants except for the City of York.  Defendant City of York filed an Answer to the Third Amended Complaint on April 19, 2004 and the present Motion for Summary Judgment on May 04, 2004.

## III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 249.  The evidence presented must be viewed in the light most favorable to the non-moving party.  Id.  "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other."  Id.  This standard does not change by virtue of cross-motions being presented.  United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims,

the non-moving party may not simply sit back and rest on the allegations in the complaint.  Instead, the

non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The evidence must be

viewed in the light most favorable to the non-movant. See Groman v. Township of Manalapan, 47 F.3d

628, 633 (3d Cir. 1995).  Summary judgment should be granted where a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case and on which

that party will bear the burden at trial." Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court

should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or

speculative.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  There must be more

than a scintilla of evidence supporting the nonmoving part and more than some metaphysical doubt as to

the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).

## IV.    Discussion

In his Third Amended Complaint, Plaintiff claims: unlawful discrimination based upon race

(Count I); unlawful retaliation (Count II); breach of contract (Count V); unlawful discrimination based

upon age (Count VII); hostile work environment in violation of Title VII (Count VIII); and violation of

his right to freedom of speech under the First Amendment of the United States Constitution.  (Doc. No.

29.)  In its Motion for Summary Judgment, Defendant seeks dismissal of all of the above counts.  The

Court will address each of Defendant's arguments in turn according to similar claims.

A.      **Discrimination**

Although Plaintiff does not state a legal basis for the unlawful discrimination he alleges in Count I of his Third Amended Complaint, in Count II, he claims that he is in a protected class of forty-nine year old Hispanic males of Puerto Rican ancestry and the disciplinary action he faced was unlawful retaliation in response to Plaintiff's complaints with the PHRC and the EEOC.  (Doc. No. 29 at ¶¶ 84-95).  Furthermore, at Count VII of his complaint, Plaintiff alleges that the denial of medical leave, absence without leave ("AWOL") reprimands, and other less favorable treatment was because of his age (44), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. Based upon the above, and the briefs of both parties, this Court, by Order dated March 31, 2004, interpreted these claims as being brought pursuant to Title VII and the ADEA.[4]

1.      <u>Race (Count I)</u>

The Supreme Court set forth the analytical framework for employment discrimination cases based on circumstantial evidence in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792 (1973).[5] Pursuant to the <u>McDonnell Douglas</u> framework, a plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a <u>prima facie</u> case of discrimination.

---

[4] To the extent that Plaintiff also seeks a cause of action under the PHRA, claims of employment discrimination under Title VII and the PHRA are similarly evaluated in accordance with the framework set forth in <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)</u>.  <u>See</u> <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 382 (3d Cir. 2002) (applying the <u>McDonnell Douglas</u> analysis to PHRA claim)

[5] Title VII provides that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000) (citations omitted).         To establish a

prima facie case for discriminatory discharge, a plaintiff must show that: (1) he is a member of a

protected class; (2)  that he was subject to an adverse employment action; and (3) that similarly

situated members of other racial classes were treated more favorably.  See Jones v. School Dist., 198

F.3d 403, 411 (3d Cir. 1999).  An adverse employment action has been defined by the Supreme

Court as:

> [a] tangible employment action constitut[ing] a significant change in employment
> status, such as hiring, firing failing to promote, reassignment with significantly
> different responsibilities, or a decision causing a significant change in benefits. . .
> .  A tangible employment action in most cases inflicts direct economic harm.

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998).  The Third Circuit Court of

Appeals has defined an "adverse employment action" under Title VII as "an action by an employer that

is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of

employment."  Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (internal quotations

omitted).

If a plaintiff presents a prima facie case of discrimination, the defendant must articulate

some legitimate, nondiscriminatory reason for its actions.  Stanziale v. Jargowsky, 200 F.3d 101,

105 (3d Cir. 2000) (internal quotations omitted).  This burden is only one of production, not of

persuasion; it involves no credibility assessment.  Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 142 (2000).  Finally, if the defendant articulates such a reason, the plaintiff must

establish that the defendant's proffered reasons for the discipline was pretextual.  Id.  Thus, if the

plaintiff establishes a prima facie case of discrimination, and defendant articulates a non-

discriminatory reason for each adverse employment action, the plaintiff may survive summary judgment only if he presents evidence from which a reasonable fact finder could either disbelieve defendant's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Id.

In Count I of his Complaint, Plaintiff alleges that Defendant unlawfully discriminated against him by issuing Plaintiff a written reprimand for failing to take evidence to Court, suspending Plaintiff for running for election, denying Plaintiff's sick leave, and terminating Plaintiff for being AWOL.  (Doc. No. 29.)  Defendant does not dispute that Plaintiff is a member of a protected class.  Rather, Defendant argues that in each of the above instances, the corresponding disciplinary action does not constitute an adverse employment action and/or Plaintiff proffers no evidence to suggest that similarly situated white officers were treated more favorably.  (Doc. No 57 at 14.)  The Court will address each argument in turn.

(a)   ADVERSE EMPLOYMENT ACTION

In Weston v. Pennsylvania, 251 F.3d 410 (3d Cir. 2001), the Third Circuit found that written reprimands not permanently affixed to an employment file do not constitute an adverse employment action under Title VII.  251 F.3d at 431.  In finding that the written reprimands did not alter the plaintiff's employment status in any way, the Third Circuit noted that the plaintiff was "not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location in the prison, did not have his hours or work changed or altered in any way, and that he was not denied any pay raise or promotion as a result of these reprimands."  Id.  Similarly, the Court finds as a matter of law that the November 15, 2001 reprimand did not alter Plaintiff's employment status in any way.

Plaintiff does not assert that the reprimand actually diminished his status or prevented him from receiving a forthcoming promotion.  Until the reprimands Plaintiff received actually changed Plaintiff's status in some way, the reprimands do not constitute an adverse employment action.  Therefore, the Court will focus on whether Plaintiff puts forth any evidence that similarly situated members of other racial classes were treated more favorably with regard to Plaintiff's one-day suspension and termination.

(b) SIMILARLY SITUATED OFFICERS TREATED MORE FAVORABLY

With regard to his request for medical leave and subsequent termination upon refusing to return to work, Plaintiff puts forward no evidence of an officer of any race who was allowed to remain on sick leave after being found fit for duty by the police department's doctors.  Nor does Plaintiff produce any instance when another officer was not reprimanded and then eventually  terminated for refusing to return to work.  Rather, in his brief, Plaintiff argues that similarly situated white officers were treated more favorably in not having to wait 18 months for a termination hearing.

It appears from the record that Plaintiff's termination hearing occurred on September 22, 2003. (Defendant's Ex. 20.)  Plaintiff received multiple trial board hearings, pursuant to the Collective Bargaining Agreement and corresponding policies, for his continued refusal to return to duty between March 5, 2002 and June 27, 2002.  At these hearings, Plaintiff received sequentially more severe reprimands until finally the trial board recommend terminating Plaintiff's employment.[6]  The Court notes that Plaintiff initiated the instant civil action in this Court less than a month later, on July 18, 2002, which would certainly have impeded related administrative actions occurring at the same time.  Moreover, this

---

[6] Accordingly, Plaintiff's wait for a termination hearing is closer to 15 months.

13

appears to be a new allegation of a due process violation, not an adverse employment action.  Plaintiff's

employment status did not change because of the delay, which is in effect Plaintiff's complaint.

With respect to the one-day suspension for violating the Rules of Conduct in running for a

partisan elected public office, Plaintiff points to Officer Bloss, a white officer who was allowed to help

his father run for County Coroner.  (Plaintiff's Exhibit 4.)  However, the record demonstrates that Bloss

is not similarly situated.  Officer Bloss asked permission prior to campaigning for his father and was

advised by his superiors that he would not violate the Rules of Conduct so long as he followed certain

limitations (such as not identifying himself as a police officer while campaigning or play an active role in

the campaign).  (Plaintiff's Ex. 4.)  In essence, Bloss was restricted to merely presenting people with his

political opinion, as a private citizen, that they should vote for his father.  Conversely, it is undisputed

that Plaintiff did not ask for permission prior to seeking public office and played a very active role in his

own campaign for School Board.

Accordingly, based upon the record before the Court viewed in a light favorable to Plaintiff,

Plaintiff has failed to establish the elements of a prima facie case of racial discrimination.  Even

examining the disciplinary actions collectively, the Court finds no indication that non-Hispanic officers

receive less punishments than Hispanic officers or are held to a less strict standard vis-a-vis the Rules of

Conduct.  Plaintiff admits to the underlying facts of each violation and there is no evidence that

Plaintiff's supervisors deviated from policy guidelines in disciplining him.  The Court notes Sergeant

Fells' deposition testimony that he felt minority officers were treated "unfairly" with regard to position,

assignments, and Defendant's hiring policies.  (Defendant's Ex. 15.)  However, Plaintiff does not claim

that he was unfairly discriminated against with regard to his rank or assignments.  Nor does Plaintiff

allege that anyone ever said or did anything overtly racist to or about him.  One officer's general feeling of unease about the treatment of minority officers at the York City Police Department, though troubling, does not by itself establish a prima facie case of racial discrimination.  Accordingly, Defendant's motion for summary judgment on this claim will be granted and Count I of the Third Amended Complaint will be dismissed.

      2.    <u>Age</u>

In order to prevail on an intentional age discrimination claim under the ADEA, a plaintiff must show that his or her age "'actually motivated'" or "'had a determinative influence on'" the employer's adverse employment decision.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 141 (2000) (quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)).  A plaintiff can meet this burden by either presenting direct evidence of discrimination or by presenting indirect evidence of discrimination that satisfies the three-step framework of <u>McDonnell Douglas</u>.  <u>Potence v. Hazleton Area Sch. Dist.</u>, 357 F.3d 366, 370 (3d Cir. 2004) Plaintiff does neither.  Plaintiff points to no evidence nor makes any arguments in support of his claim under the ADEA.  Accordingly, Defendant's motion for summary judgment on this claim will be granted and Count VII of the Third Amended Complaint will be dismissed.

    **B.**    **Retaliation**

In order to maintain a viable claim of retaliation under Title VII, a plaintiff must establish that: (1) he engaged in a protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1299

(3d Cir. 1997).  As addressed more fully above, an adverse employment action must rise to the level of "altering the employee's compensation, terms, conditions, or privileges of employment, depriv[] him or her of employment opportunities, or adversely affect[] his [or her] status as an employee."  Robinson, 120 F.3d at 1300 (internal quotation marks omitted).

"The mere fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  Id. at 1302. The Third Circuit has held that the existence of a causal link "must be considered with a careful eye to the specific facts and circumstances encountered."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3d Cir. 2000).

In Count II of his Third Amended Complaint, Plaintiff asserts that after he filed a dual complaint with the PHRC and EEOC on August 9, 1999, Defendant began retaliating against him.  As evidence of this retaliation, Plaintiff points to: the November 11, 2001 reprimand (for forgetting to take evidence to court); the January 8, 2002 refusal to grant medical leave; the March 7, 2002, March 9, 2002, and May 15, 2002 reprimands for being AWOL; and his termination.  (Doc. No. 29 at 17-20.)  Plaintiff points to no other evidence, except the chronological order of the above events, to suggest a causal connection between his participation in the protected activity and the adverse employment action. Moreover, the temporal proximity of the activity and adverse actions weighs against Plaintiff.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 323 (3d Cir. 2000) (finding that a year long lapse between the protected activity and the adverse action, without something more, could not establish that a genuine dispute existed as to the material fact of causation).  The alleged series of retaliatory activity did not begin to occur until more than two years after Plaintiff filed his complaint, and

over a year after the PHRC denied his claims.  Plaintiff does not present sufficient evidence from which

a reasonable factfinder could infer retaliation.  Accordingly, Defendant's Motion for Summary

Judgment as to this claim will be granted and Count II of the Third Amended Complaint will be

dismissed.

## C.      Breach of Contract

In Count V of his Third Amended Complaint, Plaintiff alleges that Defendant breached his

employment contract "by failing to treat him fairly and justly before taking away his employment rights

and be unfairly taking away and reducing his pension rights."  (Doc. No. 29 at 25.)  Plaintiff's

employment relationship with Defendant is governed by the Collective Bargaining Agreement entered

into by the White Rose Lodge No 15 of the Fraternal Order of Police, to which Plaintiff was a member.

(Defendant's Ex. 30.)  Plaintiff points to no specific provision of the agreement in support of his

allegation of breach.  Plaintiff also neither specifies which termination procedures were not followed nor

which specific "anti-discrimination policies" were violated.  (Doc. No. 84 at 18-19.)  Rather, Plaintiff

merely claims that a general "system of fairness" was violated by Defendant's actions.  Id.  This

appears to be merely a restatement of Plaintiff's discrimination claim and is an insufficient demonstration

of breach to survive a motion for summary judgment.  Accordingly, Defendant's Motion for Summary

Judgment as to this claim will be granted and Count V of the Third Amended Complaint will be

dismissed.

## D.      Hostile Work Environment

In Count VIII of his Third Amended Complaint, Plaintiff alleges that "Defendant['s] repeated

unwarranted reprimands, and acts of retaliation . . . placed emotional stress on [Plaintiff] such that he

17

was mentally unable to perform his job as a police officer."  (Doc. No. 29 at 30.)

In order to bring a claim for harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working <u>environment</u> which is severe enough to affect the psychological stability of a minority employee."  <u>Andrews v. Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting <u>Vance v. Southern Bell Tel. and Tel. Co.</u>, 863 F.2d 1503, 1510 (11th Cir. 1989)) (emphasis in original).  To this end, a plaintiff must demonstrate that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.  <u>Andrews</u>, 895 F.2d at 1482.

Plaintiff does not allege that anyone ever said or did anything overtly racist to or about him, nor does Plaintiff cite a single incident involving the utterance of a racial epithet, the use of a racist symbol, or any direct comment concerning race.  Rather, Plaintiff alleges that the series of reprimands and disciplinary actions previously outlined above constituted pervasive and regular discrimination, causing him great stress and anxiety.  (Doc. No. 84 at 23.)  As discussed earlier, Plaintiff failed to establish a <u>prima facie</u> case of intentional discrimination with regard to each of the disciplinary actions or in any way link the discipline to race.  Plaintiff's mere disagreement with the decisions taken by his superiors at the police department, and even his opinion that they were racially motivated, is insufficient as a matter of law to establish a hostile work environment.  Accordingly, Defendant's Motion for Summary Judgment as to this claim will be granted and Count VIII of the Third Amended Complaint will be dismissed.

18

E.        **First Amendment Retaliation**

Public employees have a First Amendment right to speak freely on matters of public concern.  Rankin v. McPherson, 483 U.S. 378, 383-84 (1987); Baldassare v. State of N.J., 250 F.3d 188, 194 (3d Cir. 2001).  This protection only extends to speech regarding matters of public concern, and that which is not likely to disrupt the efficient operation of the workplace.  Connick v. Myers, 461 U.S. 138, 146 (1983); Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).  At the same time, the government has an interest in regulating the speech of its employees to promote "efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service."  Connick, 461 U.S. at 150-51.  These interests must be balanced against the employee's interest in addressing matters of public concern and enabling the electorate to make informed decisions.  Pickering, 391 U.S. at 572.

In a public employee's retaliation claim for engaging in protected activity, there are three factors to consider.  First, the employee must demonstrate that the speech involves a matter of public concern.  Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003).  Next, the plaintiff must demonstrate that his interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public.  Id. at 413.  Third, the speech must have been a substantial or motivating factor in the alleged retaliatory action.  Id. at 414.  Also, as a defense, the employer can show that it would have taken the adverse action even if the employee had not engaged in protected conduct.  Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  The employer's defense and the third factor are questions of fact; however, the first two factors are questions of law.  Baldassare, 250 F.3d at 195.

The second prong requires "a fact-sensitive and deferential weighing of the government's legitimate interests" in regulating a public employee's speech.  Bd. of County Comm'r v. Umbehr,

19

518 U.S. 668, 677 (1996).  Governmental interests underlying the regulation of employee speech may include "whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Swartzwelder v. McNeilly, 297 F.3d 228, 235 (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)).  The Court must also take into account the extent of authority entailed in the employee's position.  Rankin, 483 U.S. at 390.

Courts have given law enforcement agencies wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks.  See Kelley v. Johnson, 425 U.S. 238, 246 (1976) (noting that police departments need significant flexibility to make decisions that affect "discipline, esprit de corps, and uniformity"); Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (recognizing the "heightened need for order, loyalty, morale, and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); O'Donnell v. Barry, 331 U.S. App. D.C. 272, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (stating that due to the "special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating speech of police officers than in regulating the speech of other governmental employees"); Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996) (noting the special need of law enforcement superiors to be assured that their subordinates will be loyal and will carry out orders).

In this case, Defendants argue that Plaintiff's free speech claim must fail because, although his speech touched on matters of public concern, it is outweighed by Defendant's interest in preventing a disruption in the morale and discipline of the York Police Department.  (Doc. No. 57

at 24.)  Plaintiff made two public pronouncements following Robertson's indictment for the 1969

murder of Lillie Belle Allen, and Grofcsik's action of sitting at the defense table during the

criminal proceedings against Robertson.  Plaintiff argues that the criminal charges and the Police

Department's handling of it were matters of public concern and his speech regarding these things

was therefore protected.

   Under <u>Pickering</u>, the balance of interests in the instant case favor Defendant.

Although the public has a strong interest in uncovering wrongdoing by public employees,

<u>Baldassare</u>, 250 F.3d at 200, Plaintiff's statements did not cast light upon hidden wrongdoings, they

merely expressed an emotional reaction and personal opinion about the character of a superior officer.

Under the Rules of Conduct, Plaintiff could have expressed his concerns about the commissioner using

proper internal channels.  The negative opinions of a disaffected police officer concerning the public

actions of the police commissioner are not of such vital public concern that they outweigh the

government's interest in maintaining order, trust, discipline and efficient communication with the public.

After a careful weighing of the balance of interests under <u>Pickering</u> and its progeny, the Court finds that

Plaintiff did not engage in protected speech as a matter of law.  Consequently, Plaintiff fails to satisfy the

first element of a First Amendment retaliation claim.  Accordingly, Defendant's Motion for Summary

Judgment as to this claim will be granted and Count IX of the Third Amended Complaint will be

dismissed.

**V.**  <u>**Order**</u>

   **AND NOW**, on this 26th  day of September, 2005, **IT IS HEREBY ORDERED** that

Defendant's Motion for Summary Judgement (Doc. No. 56) is **GRANTED**.  The Clerk of Court is

directed to enter judgment in favor of Defendant on all counts and to close the file.


 S/ Yvette Kane        
Yvette Kane
United States District Judge